**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
DAWN MCLAUGHLIN                         :
                                        :
                    Plaintiff,          :
                                        :        Civil Action No. 13-06948 (FLW)
         v.                             :
                                        :              **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY,                               :
                                        :
                    Defendant.          :
_____ :


**WOLFSON, United States District Judge:**


        Dawn McLaughlin ("Plaintiff") appeals from the final decision of the Commissioner of

Social Security ("Defendant" or "Commissioner") denying Plaintiff disability benefits under the

Social Security Act. Plaintiff contends that the record does not support the decision made by the

Administrative Law Judge ("ALJ"). Specifically, Plaintiff argues that the ALJ failed to properly

evaluate the medical evidence, and that the ALJ failed to properly evaluate Plaintiff's subjective

complaints. After reviewing the Administrative Record ("A.R."), this Court finds that the ALJ's

decision is supported by substantial evidence in the record, and accordingly, affirms the ALJ's

decision to deny Plaintiff disability benefits.


**Procedural History**

1

Plaintiff applied for Social Security Disability Benefits on June 28, 2010, alleging disability beginning April 1, 2009. A.R. 121–124. The application was denied on November 30, 2010. A.R. 63. On January 6, 2011, Plaintiff requested a hearing by an Administrative Law Judge. A.R. 75–76. A hearing was held before ALJ Barbara Dunn on January 18, 2012. A.R. 33–59. On February 6, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. A.R. 20–28. Plaintiff requested review by the Appeals Council, A.R. 14–15, which was denied on July 22, 2012, A.R. 7–12. Plaintiff filed this appeal on November 15, 2013 against the Commissioner.

**<u>Background</u>**

Plaintiff was born on September 10, 1964, and was 44 years old on the alleged disability date of April 1, 2009. She has a high school education, and prior to her disability date, Plaintiff worked as an administrative assistant for a union. A.R. 38. According to Plaintiff's testimony, her contract with the union expired, and was not renewed because she had been missing approximately two days a week of work due to back and hip pain. A.R. 38–39.

Plaintiff complained of severe pain in both hips, back, right knee, left thigh and big left toe. A.R. 42. She also stated that she has arthritis in her fingers. <u>Id.</u> Plaintiff described the pains as being at a "nine to ten" level of pain. A.R. 44. Plaintiff additionally maintained that she has suffered from depression since her boyfriend's death in a fire in 2007. <u>Id.</u> Plaintiff claims that she cannot bend over, sit or stand for long periods of time. A.R. 45. At the time of the hearing, Plaintiff was working as a "personal shopper" at Shop-Rite, for approximately 12 to 15 hours per week, making $7.60 per hour. A.R. 37. Plaintiff worked for four to five hours per day, including a lunch break and fifteen-minute breaks. A.R. 43. However, she stated that she needed to take additional "sneaky breaks" two or three times per shift, and after work she was in "bad pain." <u>Id.</u>

2

Before and after the alleged disability onset date, Plaintiff saw a number of treating physicians and medical professionals. Plaintiff also saw additional medical professionals in connection with her application for disability benefits. The relevant findings of these professionals, and the account of the vocational expert, are detailed below.

## Review of the Medical Evidence

### 1. Treating Professionals

Plaintiff was under the care of Yuliya Vinokurova, M.D. beginning in 2000. A.R. 185. In 2010, Plaintiff was being treated by Dr. Vinokurova on a monthly basis. A.R.186. Dr. Vinokurova diagnosed Plaintiff with osteoarthritis, degenerative joint disease of the sacroiliac joints, hip joints, and knee joints. A.R. 185. In a questionnaire she completed on March 2, 2010, Dr. Vinokurova described Plaintiff's symptoms as including chronic lower back pain, moderate to severe, bilateral hip joint pain, bilateral sacroiliac joint pain, insomnia, anxiety, and depression. A.R. 219. According to Dr. Vinokurova, Plaintiff could occasionally lift and carry five pounds, could stand or walk for less than two hours per day, and could sit for less than six hours per day. A.R. 221.

On July 19, 2010, in a second Multiple Impairment Questionnaire, Dr. Vinokurova diagnosed Plaintiff with, inter alia, degenerative joint disease of the hip, knee joint, and hand joints; chronic lower back pain; anxiety; depression; and post-traumatic stress syndrome. A.R. 186. She described these conditions as "chronic" and "deteriorating." Id. Dr. Vinokurova noted that MRIs of the lower spine and hip joints were pending. A.R. 187. She described Plaintiff's pain as "daily, constant" and precipitating factors included "physical exertion" and "standing, sitting, walking for too long." A.R. 188. Dr. Vinokurova opined that Plaintiff could sit for 0–1

hours per day and stand for 0–1 hours per day. Id. She recommended that Plaintiff move around every fifteen minutes, and that she not stand or walk continuously in a work setting. Id. Dr. Vinokurova concluded that Plaintiff was incapable of even low stress in a work setting, A.R. 191, and that due to her medical conditions, "exacerbated by mental/psychosocial disorders," Plaintiff's ability to work was "severely limited" and "she is not able to work at present." A.R. 192.

On January 16, 2012, in a third Multiple Impairment Questionnaire, Dr. Vinokurova repeated the same diagnosis. A.R. 333. Clinical findings included anxiety episodes, panic attacks, weight gain, and insomnia. Id. In addition, Plaintiff had poor concentration. A.R. 338. Dr. Vinokurova again opined that Plaintiff was unable to work. A.R.339. In an undated attachment to the 2012 Questionnaire, Dr. Vinokurova addressed Plaintiff's complaints of dizziness/vertigo, and recommended balance rehabilitation. A.R. 341.

During the relevant period, Plaintiff was also treated by the Jewish Board of Family and Children's Services, Inc., with an intake interview on October 20, 2009. A.R. 183. Plaintiff was diagnosed with Major Depressive Disorder Single Episode Unspecified, Bereavement, and had a GAF[1] of 48. A.R. 182. Plaintiff was treated with psychotherapy and monthly medication management sessions. A.R. 182. She was seen a total of four times, following her intake interview, and had her final treatment session on January 26, 2010. A.R. 183.

Social worker Kiki Vouyiouklis noted that Plaintiff was a client at Southern Brooklyn Mental Health Services from October 20, 2009 to March 23, 2010. A.R. 237. The social worker

---

[1] The Global Assessment of Functioning Scale ("GAF") "is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings." 65 F.R. 50746-01, 50764–65 (Social Security Administration Rules and Regulations).

stated that Plaintiff was psychiatrically evaluated on January 13, 2010, and diagnosed with Major Depressive Disorder NOS, Bereavement, Post-Traumatic Stress Disorder, and Panic Disorder with Agoraphobia.

Treatment records from Interborough Developmental and Consultation Center, dated September 7, 2010 to April 4, 2011, show an admission diagnosis of Major Depressive Disorder. A.R. 281. The Intake Assessment Form, dated September 7, 2010, gave Plaintiff a tentative diagnosis of Major Depressive Disorder, severe; noted her back pain, hip pain, and joint disease; and gave Plaintiff a GAF of 45. A.R. 291. A Treatment Plan record dated March 30, 2011, describes Plaintiff as suffering from "back, hip pain, joint disease" and "physical pain, grief," and gave Plaintiff a GAF of 53. A.R. 285. The Plan recommended weekly individual psychotherapy. Plaintiff was discharged from care for noncompliance. A.R. 281.

### 2. Non-Treating Sources

On July 21, 2010, Plaintiff was psychiatrically evaluated by Michael Alexander, Ph.D., an agency consultative psychologist. A.R. 224. Dr. Alexander noted that Plaintiff had difficulty falling asleep, and further symptoms of depression, but no evidence of panic or manic-related symptoms. Id. Dr. Alexander described plaintiff as "cooperative, friendly, and alert." A.R. 225. Her attention and concentration were "intact" and she "was able to count, perform simple calculations, and serial 3s." Id. Her recent and remote memory skills were likewise "intact" and her cognitive functioning was "average" and "appropriate to her age." A.R. 226. Dr. Alexander found that Plaintiff could "dress, bathe, and groom herself," as well as "cook, clean, shop, manager her own money, and . . . take public transportation independently." Id. Dr. Alexander concluded that Plaintiff's psychiatric problems "do not significantly interfere with the claimant's

ability to function on a daily basis." Id. He recommended that Plaintiff continue with psychiatric medication, and recommended bereavement counseling. A.R. 227.

On August 9, 2010, Plaintiff underwent an Internal Medicine Examination with Rahel Eyassu, M.D., an agency consultative internist. A.R. 229. Dr. Eyassu noted Plaintiff's "history of osteoarthritis, degenerative joint arthritis" and "arthritis of her lower back." Id. Dr. Eyassu wrote that Plaintiff did not appear to be in acute distress, but had an "antalgic gait" and had difficulty walking on her heels and toes, and attempting to squat. A.R. 230. Plaintiff's cervical spine showed flexion/extension at 0 to 30 degrees, rotation at 0 to 60 degrees, lateral flexion at 0 to 30 degrees. A.R. 231. Lumbar spine showed forward flexion at 0 to 30 degrees, extension at 0 to 15 degrees, and lateral and rotary movement at 0 to 20 degrees. Id. Straight leg raising at 0 to 40 degrees elicited pain. Id. Forward elevation and abduction of the shoulders was 0 to 110 degrees, with complaint of pain. Id. Flexion/extension of the bilateral hip was 0 to 50 degrees, with interior rotation 0 to 20 degrees, and exterior rotation 0 to 40 degrees. Id. Flexion/extension of the right knee was at 0 to 120 degrees, with pain. A.R. 232. An X-Ray of the lumbosacral spine showed "moderate straightening," A.R. 235, and an X-Ray of the right hip show no significant bony abnormality, despite the severe limitation on her exam. A.R. 234, 232. Dr. Eyassu concluded that Plaintiff had "marked limitation on squatting, kneeling, crawling, and repetitive bending," as well as "moderate limitation on prolonged walking and stair climbing." A.R. 232.

In a Psychiatric Review Form dated November 30, 2010, W. Skranovski, a non-examining state agency reviewer, found that Plaintiff has an affective disorder, which was not severe. A.R. 258. Skranovski opined that Plaintiff had no restriction of activities of daily living, and no difficulties maintaining social functioning, no difficulties maintaining concentration,

persistence or pace, and no repeated episodes of deterioration. A.R. 268. The conclusion was that

Plaintiff's depression showed no related functional limitations. A.R. 270.


**Testimonial Record**

### 1. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff described her physical problems as including

"severe pain in both hips, my back, my left thigh [which] is numb, along with my big left toe."

A.R. 42. She further stated that her fingers were "all cramped up" due to arthritis" and that her

right knee "swells up and you can actually hear it click when I walk." Id. Plaintiff's primary pain

was in her hips and her back. A.R. 44–45. She could not bend over to pick something up on the

floor, or sit too long. A.R. 45. According to Plaintiff, the pain was a "nine to ten" out of ten. A.R.

44. Plaintiff was taking "Percocet, Xanax, everything and anything over-the-counter that will try

to ease my pain," and she stated that the pain "eases a little bit" after taking medication. Id.

Plaintiff testified that she had begun taking Xanax following the death of her boyfriend in a fire

in 2007. Id.

Plaintiff testified that she was living with friends of hers in New Jersey, and that she had

come to New Jersey in March of 2010. A.R. 40. Prior to moving to New Jersey, she lived in

Brooklyn. Id. Plaintiff received unemployment benefits in 2009 or 2010, after leaving her job as

a secretary for a makeup artist and hairstylist union. A.R. 37–38. Plaintiff had been under a five-

year contract with the union, which was not renewed because "toward the end I was taking off a

lot"; she estimated she was calling out approximately two times a week for pain in her back and

hips. A.R. 38–39.

At the time of the hearing, Plaintiff was working approximately 12 to 15 hours per week as a personal shopper at Shop-Rite. A.R. 37. She made $7.60 per hour. Id. Although the store had asked if she could work more hours, Plaintiff testified that her "body won't permit" the extra work. Id. Plaintiff had worked at that job since April of 2011. A.R. 39. Plaintiff stated that she worked four to five hour shifts, with a half hour lunch break, and a fifteen minute break. A.R. 43. However, Plaintiff found it necessary to take "sneaky breaks" two to three times per day, because "[a]fter I'm walking around for a little while it hurts." Id. Although Plaintiff was "not really" required to lift anything heavy, after working she was "in bad pain." Id. On days that Plaintiff did not work, she "just lay in bed" and "watch[ed] TV." A.R. 44.

Under questioning from the ALJ, Plaintiff explained that she had developed knee problems when she was installing cables for the phone company at a younger age. A.R. 46.  She also stated that she first sought psychiatric care following her boyfriend's death in 2007, but continued working until April 2009. A.R. 47. Plaintiff had also been treated for her pain prior to her boyfriend's death, but was not being treated in April 2009. A.R. 48–49. Plaintiff stated that her depression affected her functioning because she had "no desire even to talk to people" and was "always tired." A.R. 52.

### 2. Vocational Expert's Testimony

Jackie Wilson, an "impartial vocational expert," A.R. 20, also testified. The ALJ asked Ms. Wilson to assume the following facts: "The claimant can occasionally lift ten pounds, frequently less than ten, stand or walk at least two hours in an eight-hour day, sit six hours in an eight-hour day. . . . She can occasionally climb ramps and stairs. Never climb ladders, ropes, or scaffolds. She can occasionally kneel, crouch, and crawl." A.R. 54. In response to the hypothetical, Ms. Wilson stated that "the occupation of secretary would fall within that

classification. It is sedentary." Id. However, when the ALJ added to the hypothetical that "the claimant has the option to sit or stand every hour so she can alternate positions. And, she can do simple, routine work," A.R. 55, Ms. Wilson stated that Plaintiff could not perform her past relevant work. Id. Ms. Wilson was then asked if "a person with the claimant's age, experience and educational level [could] do other work in the national and regional economy with those restrictions?" Id. Ms. Wilson testified that such an individual could work as a "[ad]dresser"[2] which is "unskilled work," and of which there are 13,201 in the national economy and 834 in the metropolitan New York economy. Id. Ms. Wilson also stated that Plaintiff could perform the occupation of "document preparer, microfilming" which is also unskilled, with 21,461 positions in the national economy and 942 in the local economy, and the occupation of "charge account clerk, which is unskilled, with 2,350 in the national economy and 108 in the local economy. A.R.56. Ms. Wilson's opinion did not change when the ALJ added to the hypothetical "no more than frequent handling and fingering." A.R. 57.

Plaintiff's counsel then gave Ms. Wilson the following hypothetical: whether an individual with the same age, education and work experience who could "sit for two hours, stand and walk for two hours in a day with no pushing, pulling, kneeling, bending, stooping and would be off task 15% of the day" could "perform past relevant work or any jobs in the local or national economy." A.R. 57–58. Ms. Wilson stated that such a person could not perform any work. A.R. 58.

**ALJ Findings**

---

[2] In the hearing transcript, Ms. Wilson says "dresser," but gives the Dictionary of Occupational Titles number 209.587-101, which corresponds to "addresser." The ALJ's decision gives this occupation as "addresser."

The ALJ began by finding that Plaintiff met the insured requirements of the Social Security Act through December 31, 2014. A.R. 22. The ALJ then applied the standard five-step process to determine if Plaintiff had satisfied her burden of establishing disability. Id. The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 1, 2009, the alleged onset date; the ALJ acknowledged that Plaintiff's employment at Shop-Rite was not substantial gainful activity. Id. The ALJ next found that Plaintiff had the following severe impairments: lumbar radioculopathy, degenerative joint disease, lower back pain, chronic obstructive pulmonary disease, depression, post-traumatic stress disorder, anxiety, and insomnia. Id. However, the ALJ concluded that Plaintiff's impairments, singly or in combination, did not meet or medically equal one of the listed impairments under the SSA that would automatically qualify for disability benefits. A.R. 22–23.

The ALJ then found that Plaintiff had the residual functional capacity, in an eight hour workday, to "sit up to six hours, stand/walk up to two hours, lift/carry up to ten pounds occasionally and less than ten pounds frequently, and push/pull up to ten pounds occasionally and less than ten pounds frequently." A.R. 23. Additionally, according to the ALJ, Plaintiff could perform work which involves "no climbing ladders/ropes/scaffolds; and no more than occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling." A.R. 23–24. The ALJ found that Plaintiff could perform work "involving no more than frequent handling and fingering" and "no more than simple, routine work." A.R. 24. The ALJ considered Plaintiff's testimony, and found that her medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effectives of these symptoms are not persuasive." Id. The ALJ described the medical testimony of Dr. Vinokurova, Interborough Developmental and

Consultation Center, Dr. Alexander, and Dr. Eyassu. A.R. 25-26. The ALJ then stated that she gave "little weight to the opinions of Dr. Vinokurova" because those opinions "are not supported by the medical evidence or the claimant's own testimony." A.R. 26. Specifically, "[t]he fact that the claimant works on a part time basis further contradicts the opinions of the treating medical doctor." Id.

The ALJ next held that Plaintiff was unable to perform past relevant work. A.R. 26–27. However, considering Plaintiff age, education, work experience, and residual functional capacity, the ALJ found that "there are jobs that exist in significant numbers in the national economy" that Plaintiff could perform. A.R. 27. The ALJ acknowledged that Plaintiffs' "ability to perform all or substantially all of the requirements" of sedentary work "has been impeded by additional limitations." Id. The ALJ, though, credited the vocational expert's testimony regarding the ability of an individual "with claimant's age, education, work experience, and residual functional capacity" to work in occupations such as an addresser, a document preparer, or a charge account clerk. A.R. 27–28. Thus, the ALJ concluded that Plaintiff had not been under a disability from April 1, 2009 through the date of the decision, February 6, 2012.

**Standard of Review**

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial

11

evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

**Standard for Entitlement to Benefits**

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. Id. § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." Id. § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146–47 n. 5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146–47 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. Id. § 404.1520(c); see Plummer, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. See id. § 404.1520(d); see also Bowen, 482 U.S. at 146–47 n. 5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. §

404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146–47 n. 5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

**Plaintiff's Claims on Appeal**

**1.  ALJ's Evaluation of Medical Evidence**

Plaintiff contends that the ALJ failed to properly evaluate the medical evidence, specifically with regard to the ALJ's residual function capacity determination. Pl. Br. at 17. First

14

Plaintiff claims that the ALJ did not explain how or whether she accounted for Plaintiff's vertigo/dizziness, or Plaintiff's chronic obstructive pulmonary disease. Id. at 17, 19. With regard to the vertigo/dizziness, Plaintiff claims that the ALJ failed to acknowledge "the existence of this impairment though counsel brought it to her attention at the hearing." Id. at 18.  According to the plaintiff, the ALJ's failure to discuss whether Plaintiff's dizziness/vertigo was a severe impairment at step two was error. Id. Plaintiff also asserts that, while the ALJ noted that Plaintiff's chronic obstructive pulmonary disease was a step-two severe impairment, the ALJ did not note Dr. Vinokurova's observations or the pulmonary function testing, and did not include any environmental limitations in her residual functional capacity determination. Id. at 19.

A claimant has the initial burden of demonstrating that she has a severe impairment. Bowen, 482 U.S. at 146; 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). A severe impairment must "limit significantly the claimant's ability to perform most jobs." Bowen, 482 U.S. at 146; see also 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities").

"The step-two inquiry is a de minimis screening device to dispose of groundless claims." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). A determination that a claimants' request should be denied at step two "should be reviewed with close scrutiny." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). Here, the ALJ did not end her analysis at step two, but found that Plaintiff had severe impairments other than dizziness or vertigo; such close scrutiny is thus not required. Furthermore, the medical evidence does not show that Plaintiff's complaint of dizziness and vertigo significantly limited Plaintiff's ability to

perform basic work activities. Plaintiff did not mention that vertigo prevented her from working, see A.R. 42–44, nor did Dr. Vinokurova address Plaintiff's vertigo in any of the physician's Multiple Impairment Questionnaires. Plaintiff has not, therefore, shown that dizziness and vertigo were a severe impairment. With regard to Plaintiff's pulmonary disease, none of Plaintiff's evidence suggested that she required environmental limitations. See, e.g., A.R. 192 (describing limitations affecting ability to work), A.R. 339 (same). The ALJ's failure to address these impairments in her analysis hence does not require a remand or reversal.

Plaintiff next argues that the ALJ erred in discounting the opinions of Plaintiff's treating physician, Dr. Vinokurova, and that the ALJ's residual functional capacity determination "overstates her abilities." Pl. Br. at 19–22. According to Plaintiff, Dr. Vinokurova's opinion that Plainitff cannot engage in sustained work is supported by Dr. Vinokurova's notes, Dr. Eyassu's observations, and by Plaintiff's testimony. Id. at 20. In addition, Plaintiff takes issue with the ALJ's suggestion that Plaintiff's ability to perform part-time work undermined Dr. Vinokurova's conclusions. Further, Plaintiff argues that "the ALJ failed to give full and proper consideration to the evidence concerning her mental impairments." In particular, Plaintiff cites the ALJ's failure to evaluate Plaintiff's GAF scores of 45 and 48 by the Jewish Board of Family and Children's Services, and the Interborough Developmental and Consultation Center. Id. at 23.

Defendant, in contrast, argues that Dr. Eyassu's findings—that Plaintiff had limitations in squatting, kneeling, crawling, and repetitive bending, and that Plaintiff should avoid heavy lifting—support the ALJ's finding that Plaintiff could perform sedentary work. Def. Br. at 6–7. Additionally, Defendant notes Dr. Eyassu's X-ray findings showing no acute bony abnormality in Plaintiff's right hip, which led to a conclusion that the severe hip limitations found in testing were not supported. Def. Br. at 7. Defendant asserts that Dr. Eyassu concluded that Plaintiff's

impairments "did not prevent her from performing sedentary work," contradicting Dr.

Vinokurova's conclusion that Plaintiff was unable to work. Def. Br. at 8–9. According to

Defendant, Plaintiff's part-time work also undermined Dr. Vinokurova's conclusion.

Under 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion will be given

controlling weight if the opinion "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

your case record." Additional factors to be used to determine the weight given to a medical

opinion include, inter alia: length of treatment relationship, the nature and extent of the treatment

relationship, supportability by medical evidence, and consistency with the record as a whole. Id.

If a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may

choose whom to credit but cannot reject evidence for no reason or for the wrong reasons."

Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on

"contradictory medical evidence" in rejecting the treating physician's opinion, rather than

"credibility judgments, speculation or lay opinion." Id.  An ALJ is required to provide "an

explanation of the reasoning behind [her] conclusions," including "reason(s) for discounting"

rejected evidence. Fargnoli v. Massanari, 247 F.3d 34 (3d. Cir. 2001).

Although the ALJ could have been more detailed in her explanations, the record

nonetheless supports her decision to "give little weight" to Dr. Vinokurova's opinion. A.R. 25.

Dr. Eyassu's report, though largely in agreement with Dr. Vinokurova's diagnoses, see A.R. 232,

A.R. 333, resulted in findings of a "fair" prognosis and described limitations consistent with

sedentary work. A.R. 232; see also 20 C.F.R. § 404.1567(a) (defining "sedentary work" as

involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles

like docket files, ledgers, and small tools. Although a sedentary job is defined as one which

involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."). Dr. Eyassu's report clearly described the medical evidence that led to these conclusions, including physical examinations and an X-ray that did not support Plaintiff's "severe limitation" in her right hip. A.R. 230–233. The ALJ therefore properly relied on objective medical evidence that contradicted Dr. Vinokurova's opinions.

The ALJ found that Plaintiff's testimony that she worked part-time undermined Dr. Vinokurova's opinion. The ALJ appropriately relied on this testimony, as the work a person does during the alleged disability period, even if not substantial gainful activity, may show that a claimant is able to perform some activity. See 20 C.F.R. § 404.1571.

Regarding Plaintiff's mental impairments, the ALJ noted Dr. Alexander's finding that Plaintiff's psychiatric problems did not interfere with her ability to function on a daily basis. A.R. 25–26. This stood in contrast with Dr. Vinokurova's opinion that Plaintiff's mental and psychosocial disorders contributed to her inability to work. A.R. 192. Although not cited by the ALJ, the findings of W. Skranovski also found no functional limitations. A.R. 270. Similarly, the records from the Interborough Developmental and Consultation Center, which were referenced by the ALJ, showed improvement in Plaintiff's mental impairments with treatment, as her GAF score increased from 45 to 53. A.R. 291, 285.

The ALJ's failure to discuss Plaintiff's GAF scores is also not sufficient cause for a remand. Although there are cases where failure to discuss low GAF scores has been cause for a remand, see Irizarry v. Barnhart, 233 Fed. App'x 189, 192 (3d Cir. 2007), nonetheless, if an ALJ incorporates references to the opinion or medical evidence where the GAF score was found, the failure to explicitly reference the score will not detract from her reasoning. See Gilroy v. Astrue, 351 Fed. App'x 714, 716 (3d Cir. 2009) (finding no error where ALJ did not explicitly reference

18

doctor's GAF score, but made "repeated references to observations" from doctor's reports);
Carpenter v. Comm'r of Soc. Sec., No. 10-5762, 2013 WL 194384, at *4 (D.N.J. Jan. 23, 2012)
(same). Further, where the medical evidence fails to explain the basis for a GAF rating, the Third
Circuit has found that an ALJ cannot be expected to "have responded to that rating in a more
satisfactory manner." Gilroy, 351 Fed. App'x at 716.

Here, the ALJ referenced the Interborough Developmental and Consultation Center's
records. A.R. 25. While the ALJ did not mention Plaintiff's initial GAF score of 48, Plaintiff
fails to note that her score rose to 53 with treatment, which undermines her claim that this was
error meriting remand. A.R. 291, 285. In addition, ALJ's failure to mention Plaintiff's treatment
at the Jewish Board of Family and Children's Services is not problematic, as the entire record of
that treatment consists of a mere two pages, and the basis for the GAF score is completely
unexplained. A.R. 182–83. It is, therefore, unclear "how the ALJ could have responded to that
rating in a more satisfactory manner." Gilroy, 351 Fed. App'x at 716.

Overall, substantial evidence in the record supports the ALJ's evaluation of the medical
evidence.

### 2. Plaintiff's Credibility

Plaintiff argues that the ALJ's evaluation of Plaintiff's testimony as "'not persuasive to
the extent that [it is] inconsistent with' the ALJ's residual functional capacity determination" is
insufficient to withstand judicial review. Pl. Br. at 24. Plaintiff also asserts that the ALJ failed to
consider Plaintiff's "impressive work history" in coming to her conclusion. Id. at 25. Defendant
argues that "it is well within the discretion of the commissioner to evaluate the credibility of
Plaintiff's complaints and render an independent judgment in light of the medical findings and

other evidence." Def. Br. at 13. Defendant also asserts that a claimant's testimony of subjective pain is not entitled to credibility "solely because she has an exemplary work history." Id. at 14.

In evaluating symptoms, the ALJ must consider "all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). However, after the ALJ finds a medical impairment which could cause the symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 361. Thus, the ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.

The ALJ found that Plaintiff's "medical determinable impairments could reasonably be expected to cause some of the alleged symptoms" but was not persuaded by Plaintiff's statements regarding "the intensity, persistence and limiting effects of these symptoms." A.R. 24. The ALJ then described the relevant medical testimony, including the findings of Dr. Eyassu, which led to the ALJ's conclusion that Plaintiff's impairments were less severe than she had claimed. A.R. 26. Again, while the ALJ's decision could have been more detailed regarding the medical evidence which contradicted Plaintiff's testimony, her conclusions are supported by substantial evidence in the record.

Additionally, Plaintiff's argument that her long work history lends support to her testimony regarding her capabilities is without merit. Although the Third Circuit has stated that, for a claimant with a long work history, "testimony as to his capabilities is entitled to substantial credibility," such testimony nonetheless must be "supported by competent medical evidence."

20

Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). Here, the ALJ did not entirely discredit Plaintiff's testimony; however, she found that portions of it were not supported by medical evidence. That was not error. Under the highly deferential standard of review, this Court cannot substitute its opinion for that of the ALJ.

**Conclusion**

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed.  An appropriate Order shall follow.

Dated: December 3, 2014                                  /s/ Freda L. Wolfson
                                                The Honorable Freda L. Wolfson
                                                 United States District Judge